UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| VT HALTER MARINE, INC. | § |
| | § |
| VERSUS | § CIVIL ACTION NO. 16-12823 |
| | § |
| A&C MACHINE, INC., aka or dba | § |
| FLOW LINE VALVE CONTROLS, | § JUDGE: |
| INC., CAJUN PROCESS SOLUTIONS | § |
| INC., and XYZ INSURANCE | § |
| COMPANIES | § MAGISTRATE: |
| | § |
| | § |

**COMPLAINT**

NOW INTO COURT, through undersigned counsel, comes Plaintiff VT Halter Marine, Inc. ("VT Halter"), which brings suit against Defendants A&C Machine, Inc., also known as or doing business as, Flow Line Valve and Controls, Inc. ("Flow Line"); Cajun Process Solutions, Inc. ("CPS") and their respective insurers ("XYZ Insurance Companies") (collectively "Defendants"), and respectfully represents the following:

**PARTIES**

1.

At all material times, Plaintiff VT Halter is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 900 Bayou Casotte Parkway, Pascagoula, Mississippi.

2.

Defendant Flow Line is a corporation organized and existing under the laws of the State of Louisiana, having its principal place of business at 110 Main Project Road, Schriever, Louisiana 70395.  Upon information and belief, Flow Line changed its name to A&C Machine, Inc. in 2011.

3.

Defendant CPS is a Louisiana limited liability company licensed to do business in Louisiana and doing business in the state of Louisiana, with its principal place of business at 15524 Airline Highway, Baton Rouge, Louisiana, 70817.

4.

Also made Defendants herein are XYZ Insurance Companies, who are unknown insurers of CPS and Flow Line, which issued one or more policies of insurance which may be available to satisfy any or all parts of judgments rendered in this case.

## JURISDICTION AND VENUE

5.

Jurisdiction is proper pursuant to 28 U.S.C.A. § 1332, as complete diversity exists between VT Halter Marine and defendants CPS and Flow Line. Further, the amount in controversy exceeds the jurisdictional minimum required by statute.

6.

Venue is proper pursuant to 28 U.S.C.A. § 1391 as this is the judicial district in which all defendants reside.

## FACTUAL ALLEGATIONS

7.

VT Halter is a shipyard located in Pascagoula, Mississippi that is in the business of building and repairing ships and other vessels, among other related business pursuits.

8.

On February 13, 2013, VT Halter entered into a contract with Bouchard Transportation Co., Inc. ("Bouchard") pursuant to which VT Halter constructed an articulate tug-barge unit,

consisting of two vessels—a tug and a barge (collectively referred to as a "Unit"). Pursuant to an option exercised by Bouchard under the Contract, VT Halter also built a second, identical Unit for Bouchard.

9.

The barge component of each of the Units would later become known respectively as Bouchard Barge B No. 270 and Barge B No. 272.

10.

Article 8.5 of the Contract provides that VT Halter "does not warrant that any equipment or materials purchased by it from a supplier or manufacturer for installation in the Unit is free from manufacturers' defects or deficiencies and [Bouchard] specifically releases [VT Halter] from any such implied warranty of fitness or workmanship or freedom from defects relating thereto except for defects in installation per Article 8.4."

11.

Within Article 8.5 of the Contract the parties further agreed that VT Halter would transfer and assign to Bouchard all warranties, express or implied, relative to third-party furnished equipment, materials or components "without warranty of [VT Halter] with respect thereto" and VT Halter would cooperate with Bouchard with regard to the enforcement of such warranties.

12.

The cargo and ballast valves that were installed by VT Halter upon Barges B No. 270 and B No. 272 were procured by VT Halter from CPS and manufactured by Flow Line, after extensive discussions among VT Halter, CPS, Flow Line and Bouchard regarding the intended use, type, design and specifications of the valves.

13.

Pursuant to a series of Purchase Orders issued by VT Halter to CPS, VT Halter purchased valve and valve components manufactured by Flow Line (collectively, hereinafter the "Valves") for installation upon the Bouchard Barges. *See* Exhibit A, Purchase Orders, *in globo*.

14.

Upon information and belief, CPS entered into a contract with Flow Line for the purchase of the Valves that were sold by CPS to VT Halter for installation upon the Bouchard Barges

15.

Barge B No. 270 was delivered to and accepted by Bouchard as part of the first Unit, which was delivered on July 11, 2015. Barge B No. 272 was delivered to and accepted by Bouchard as part of the second Unit, which was delivered on February 17, 2016.

16.

On June 17, 2016, Bouchard first put VT Halter on notice that certain leaking of cargo was occurring on the Barge B No. 272. *See* Exhibit B, 6/17/2016 Ltr to VT Halter.

17.

On June 21, 2016, counsel for Bouchard sent a demand letter to VT Halter for claims related to the "catastrophic valve failure on the barge B. No. 272, and likely similar problems on barge B. No. 270," and demanded that VT Halter provide $20 million security. *See* Exhibit C, 6/21/2016 Ltr from Phelps Dunbar to VT Halter.

18.

Notwithstanding the fact that the Contract between VT Halter and Bouchard, at Article 17.2, contains an agreement that any disputes amongst VT Halter and Bouchard arising out of the Contract, five days after making VT Halter aware of problems with the Valves, on June 22, 2016,

Bouchard filed a lawsuit against VT Halter in the United States District Court for the Eastern District of Louisiana, claiming breach of contract and breach of warranty due to the Flow Line valve failures.[1]

19.

Bouchard transported Barge B. No. 272 to Gulf Marine Repair in Tampa, Florida to undergo inspection and repairs.

20.

Bouchard has asserted that the cargo leakages were the result of multiple failures of the Flow Line Valves that were supplied by CPS to VT Halter and installed upon the barges and has demanded that VT Halter pay for the repair and/or replacement of the Valves and for Bouchard's consequential losses.[2]

21.

Immediately upon learning of these issues, VT Halter dispatched its warranty personnel to the Gulf Marine Repair yard in Tampa. VT Halter also notified CPS and Flow Line of the incident, requested the parties' full participation, and requested that the parties' honor their warranty obligations in connection with the defective Valves claim by Bouchard. *See* Exhibit D, 6/27/2016 Ltr to Flow Line and CPS; Exhibit E, 6/28/2016 Ltr to Flow Line and CPS; Exhibit F, 6/30/2016 Ltr to Flow Line and CPS.

---

[1] As of the date hereof, Bouchard has not effectuated service of this improperly filed lawsuit. To the extent that Bouchard may elect to join in this matter to assert its warranty rights and seek recovery of damages against CPS and Flow Line, VT Halter has no objection. VT Halter expressly reserves all rights to compel arbitration to the extent that Bouchard improperly attempts to assert any claims or cross-claims against VT Halter in this case.

[2] The Contract contains three express waivers by Bouchard of any consequential losses, Articles 8.3, 8.9 and 19.1.

22.

VT Halter further notified CPS and Flow Line that Bouchard had made demand upon VT Halter for repair of the allegedly defective Valves, despite the fact that VT Halter did not warrant third party supplied components against manufacturer's defects.

23.

While Barge B. No. 272 was in Tampa at Gulf Marine Repair, representatives of CPS and Flow Line attended the vessel.

24.

Upon information and belief, representatives of CPS and Flow Line inspected Barge B. No. 272 and the Flow Line Valves.

25.

Despite the multiple notice and demand letters issued to CPS and Flow Line to fulfill warranty obligations and cure the defects in the Valves alleged by Bouchard, CPS and Flow Line have ignored these requests and VT Halter is required to take legal action accordingly.

## CAUSES OF ACTION

## COUNT ONE: BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

26.

VT Halter adopts and incorporates by references the preceding allegations of this Complaint as if fully set forth therein.

27.

Defendants CPS and Flow Line have breached the implied warranty of merchantability in violation of Miss. Code. Ann. § 75-2-314.

28.

A warranty that goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.

29.

According to its own website, Defendant CPS is a distributor of valves and valve accessories utilized by industrial and marine markets, and thus is a merchant with respect to Valves that are the subject of this Complaint.

30.

According to its own website, Defendant Flow Line is a manufacturer of valves and valve accessories utilized by industrial and marine markets, and thus is a merchant with respect to Valves that are the subject of this Complaint.

31.

According to Bouchard, the Valves manufactured by Flow Line and sold to VT Halter by CPS were not merchantable within the meaning of Miss. Code. Ann. § 75-2-314(2).

32.

Bouchard has notified and made claims against VT Halter that the Valves were defective and allowed for cargo leakage and thus were not fit for the ordinary purpose for which such goods are used.

33.

Upon information and belief, the Valves did not pass without objection in the trade under the contract description within the meaning of Miss. Code. Ann. § 75-2-314(2). Further, according to Bouchard, the Valves did not meet national standards, American Petroleum Institute ("API")

Standards, and did not meet the specifications to which they were designed. Further, the Valves allegedly allowed for liquid cargo leakage.

34.

In order to exclude or modify the implied warranty of merchantability, the language in the contract of sale must expressly mention merchantability and must be conspicuous. Miss. Code Ann. §75-2-316(2).

35.

This implied warranty of merchantability was neither excluded nor modified by CPS in its sale of the Valves to VT Halter.

36.

Upon information and belief, Flow Line did not exclude or modify its implied warranty of merchantability in its sale of the Valves to CPS.

37.

CPS and Flow Line did not modify or exclude the implied warranty of merchantability in its Purchase Orders and/or related documents supporting the sale of the valve and valve components, and thus the warranty attached to the valves and valve components.

38.

According to Bouchard, the valves were not merchantable as they were defective and allowed leakage of cargo upon Barges B No. 270 and B No. 272.

**COUNT TWO: BREACH OF EXPRESS WARRANTY**

39.

VT Halter adopts and incorporates by references the preceding allegations of this Complaint as if fully set forth therein.

40.

Defendants CPS and Flow Line breached the express warranty created by Miss. Code Ann. § 75-2-313 which attached to the Valves sold by CPS to VT Halter through the Purchase Orders attached as Exhibit A.

41.

Express warranties are created by the seller if any affirmation or fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty the goods shall conform to the affirmation or promise. Miss. Code. Ann. § 75-2-313 (a).

42.

An express warranty that the goods shall conform to the description is created when a description of the goods is made part of the basis of the bargain. Miss. Code. Ann. § 75-2-313 (b).

43.

Defendants Flow Line and CPS expressly warranted that the Valves would be properly functioning under the contract specifications and in the manner intended upon the Bouchard Barges. The Purchase Orders issued by CPS listed prices of Valves built to the contract specifications, that would function as intended to prevent leakage of liquid cargo, and thus the express warranty that the valves would function as intended was expressly warranted by CPS and Flow Line. It was understood by all parties that CPS was selling functioning valves manufactured to contract specifications and thus VT Halter expected the goods to conform to that promise. It was further understood that same valves supplied by Flow Line to CPS would conform to the same promise.

44.

Defendants further expressly warranted that the valve and valve components would meet national standards, API standards, and would conform to the approved drawings for the valves and valve components.  Upon information and belief, the valves and valve components did not meet national standards and were non-conforming to the approved drawings.

## **COUNT THREE: BREACH OF IMPLIED WARRANTY – FITNESS FOR PARTICULAR PURPOSE**

45.

VT Halter adopts and incorporates by references the preceding allegations of this Complaint as if fully set forth therein.

46.

Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is, unless excluded or modified under Section 75-2-316, an implied warranty that the goods shall be fit for such purpose.  Miss. Code. Ann. § 75-2-315 (West).

47.

CPS, as a known distributor of valves and valve components for marine purposes, had reason to know that VT Halter, a shipbuilder, would be purchasing the valve and valve components for the purpose of installation in vessels and for the purpose of preventing leakage of cargo. Further, Flow Line is a manufacturer of valves and valve components and would have reason to know that the valves would be installed on vessels and would need to be suitable for such purpose. Both CPS and Flow Line participated in the selection of the proper valves and valve components for the Bouchard vessels.

48.

VT Halter relied on CPS and Flow Line to furnish suitable goods for this purpose.

49.

VT Halter relied on CPS and Flow Line to furnish a functioning Valves for installation upon the Bouchard vessels.

50.

Upon information and belief, the Valves sold by Flow Line and supplied by CPS were defective and failed to properly prevent cargo from leaking from one tank to another upon the Bouchard Barges B No 272 and B No. 270.

51.

According to Bouchard, the Valves were not suitable for their intended purpose.

52.

CPS and/or Flow Line did not exclude or modify this implied warranty in any manner as would be required by Miss. Code. Ann. § 75-2-316, thus, the warranty attached to the Valves when sold from Flow Line to CPS and then to VT Halter for installation upon the Bouchard vessels.

## COUNT FOUR: BREACH OF CONTRACT - CPS

53.

VT Halter adopts and incorporates by references the preceding allegations of this Complaint as if fully set forth therein.

54.

The elements of breach of contract are: (1) the existence of a valid and binding contract; (2) breach of the contract by the defendant; and (3) money damages suffered by the plaintiff. *Guinn v. Wilkerson*, 963 So. 2d 555, 558 (Miss. Ct. App. 2006).

55.

Per Miss. Code. Ann. § 75-2-204, a contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.

56.

Through issuance and performance of the Purchase Orders, CPS and VT Halter entered into a valid and binding contract by which CPS agreed to supply the listed Valves and VT Halter agreed to pay for those items.  *See* Exhibit A, *in globo*.

57.

The aforementioned Purchase Orders each constitute a valid contract.

58.

The Purchase Orders included descriptions of the Valves and reference their respective drawings and specifications.

59.

VT Halter performed its obligations by making payment for the contracted Valves.

60.

Based upon the information provided by Bouchard, CPS materially breached the contract between CPS and VT Halter by failing to supply Valves which conformed to the Purchase Orders.

61.

As a direct and proximate result of CPS's breach of the Purchase Orders, Plaintiff has sustained damages in an amount to be shown according to proof at trial.

## COUNT FIVE: BREACH OF CONTRACT- FLOW LINE

62.

Upon information and belief, CPS is a distributor and independent sales representative for Flow Line.

63.

In connection with the issuance of the Purchase Orders by VT Halter to CPS, Flow Line participated in discussions with CPS and VT Halter regarding the selection and purchase of Flow Line Valves by VT Halter.

64.

Upon information and belief, CPS and Flow Line entered into a valid contract amongst themselves for the sale of Valves that Flow Line knew would be distributed by CPS to VT Halter for installation upon the Bouchard barges.

65.

Based upon information provided by Bouchard, Flow Line breached its contract with CPS by failing to provide functioning and/or conforming goods to CPS.

66.

VT Halter is an intended third party beneficiary to the contract entered into between CPS and Flow Line

67.

The contract of sale entered into between CPS and Flow Line intended to benefit the ultimate party who would install the Valves.

68.

VT Halter directly benefited from the contract of sale between CPS and Flow Line, and is properly a third party beneficiary of that contract.

69.

Accordingly, VT Halter has a right to sue Flow Line for breach of that contract.

70.

Upon information and belief, Flow Line materially breached the contract by failing to supply Valves which conformed to the contract existing between CPS and Flow Line.

71.

As a direct and proximate result of Flow Line's breach of the contract, Plaintiff has sustained damages in an amount to be shown according to proof at trial.

### COUNT SIX: PRODUCTS LIABILITY

72.

VT Halter adopts and incorporates by references the preceding allegations of this Complaint as if fully set forth therein.

73.

The facts and circumstances of this matter set forth a cause of action in products liability for negligence and breach of implied warranties of merchantability and fitness for a particular purpose against Flow Line, as the manufacturer, and CPS, the seller/vendor, under Miss. Code. Ann. § 11-1-63.

74.

Based upon information provided by Bouchard, the Valves were defective.  The Valves deviated in a material way from the manufacturer's design or designer's specifications, failed to

contain adequate warnings or instruction, were designed in a defective manner, and/or breached an express warranty and/or failed to conform to other express factual representations upon which VT Halter justifiably relied upon in electing to use the product.

75.

The alleged defective condition rendered the Valves unreasonably dangerous to the user or consumer.

76.

The alleged defective and unreasonably dangerous condition of the product proximately caused the damages for which recovery is sought.

77.

VT Halter did not have knowledge of the alleged defective condition of the Valves, was unaware of the danger in the alleged defective condition, and did not voluntarily choose to expose itself to the danger of the alleged defective product.

78.

At the time that the Valves left the control of Defendants Flow Line and/or CPS, defendants knew or should have known about the danger that caused the damage for which recover is sought, and the Valves failed to function as expected.  There existed a feasible design alternative that would have to a reasonable probability prevented the harm.

79.

CPS and Flow Line are liable under Miss. Code. Ann. § 11-1-63 for damages caused by the alleged defective valves.

## COUNT SEVEN: NEGLIGENT MISPRESENTATION

80.

VT Halter adopts and incorporates by references the preceding allegations of this Complaint as if fully set forth therein.

81.

The facts and circumstances of this matter set forth a cause of action for negligent misrepresentation.

82.

Upon information and belief, Defendants misrepresented and/or omitted the true condition of the Valves and failed to disclose that the valves were defective.

83.

That representation and/or omission was material and significant.

84.

Defendants failed to exercise the degree of diligence and expertise that the public is entitled to expect of them.

85.

Plaintiff reasonably relied upon Defendants' representations concerning the condition of the Valves.

86.

Plaintiff suffered damages as a result of the direct and proximate result of its reasonable reliance upon Defendants' representations.

## COUNT EIGHT: NEGLIGENCE

87.

VT Halter adopts and incorporates by references the preceding allegations of this Complaint as if fully set forth therein.

88.

Damages suffered by Plaintiff are the result of the negligence of Defendants.

89.

The damages suffered by Plaintiff were not caused or contributed to by any fault or neglect on the part of VT Halter, but rather was caused or contributed to solely by the fault or neglect of Defendants in the following non-exclusive particulars:

  i. Alleged failure of Defendants to properly manufacture the Valves;
  ii. Failure to test, detect and remedy alleged inadequacies, deficiencies, and defects in the Valves;
  iii. Failure to warn VT Halter of any potential deficiencies, flaws, and/or defects in design, manufacture, function of the Valves;
  iv. Failure of Defendants to remedy one or more alleged unreasonably dangerous conditions; and
  v. Any and all other acts of negligence and/or fault established through discovery and/or shown at the trial of this matter.

## DAMAGES

90.

VT Halter suffered extensive monetary damages in its efforts to remediate the alleged defective Valves installed upon the Bouchard Barges.

91.

VT Halter has suffered lost time in its efforts to remediate the alleged defective Valves supplied by CPS and manufactured by Flow Line installed upon the Bouchard Barges.

92.

VT Halter has suffered damage to the relationship between itself and Bouchard as a result of these alleged defective Valves manufactured by Flow Line and supplied by CPS.

93.

VT Halter has suffered damage to its reputation within the industry as a result of the alleged defective Valves supplied by CPS and manufactured by Flow Line.

94.

VT Halter seeks these damages in addition to consequential damages as a result of CPS's and Flow Line's breach of contract, specifically loss of revenue and loss of profits.

95.

To the extent that any liability accrues on the part of VT Halter to Bouchard or any other party as a result of CPS's and/or Flow Line's failure to accept liability and/or remediate any defective Valves, VT Halter is entitled to indemnification from CPS and Flow Line as that liability and/or such damages.

96.

Pursuant to Miss. Code. Ann. § 75-2-715, VT Halter is entitled to incidental damages resulting from Defendants' breach of contract.  These incidental damages include injury to property proximately resulting from any breach of warranty.

97.

The aforesaid damages have been exacerbated by Defendants' wrongful denial of liability and failure to honor its warranty obligations.

98.

Accordingly, VT Halter demands damages from Defendants for recovery of all losses and damages sustained as a result of the alleged defective Valves, plus all interests, costs, and all other legal and/or equitable relief to which VT Halter is entitled by law.

WHEREFORE, Plaintiff VT Halter hereby prays that that Defendants Cajun Process Solutions, Inc., A&C Machine, Inc., also known as or doing business as, Flow Line Valve Controls Inc., and XYZ Insurers be required to appear and answer these matters, and that after due proceedings had, that VT Halter have judgment in its favor and against Defendants for recovery of all losses and damages as a result of the sale of the alleged defective valves, plus all interest, costs, and all other legal and/or equitable relief to which Plaintiff is entitled.

Respectfully submitted:

**BLAND & PARTNERS P.L.L.C.**

      /s/ DAVID S. BLAND      
DAVID S. BLAND (LA Bar #1257)
JULIE M. ARAUJO (LA BAR #26174)
MALLORY G. WYNNE (LA Bar #33851)
909 Poydras Street, Suite 1860
New Orleans, LA 70112
Telephone:    504.528.3088
dbland@blandpartners.com
jaraujo@blandpartners.com
mwynne@blandpartners.com
*Attorneys for Plaintiff, VT Halter Marine, Inc.*